Filed 3/1/23  In re Clare M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CLARE M., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>G.L.,<br><br>　　　Defendant and Appellant. | A165427<br><br>(Marin County<br>Super. Ct. No. JV27036A) |

G.L. (Father) appeals from the juvenile court's order terminating his parental rights over his daughter Clare M. (Daughter).  His sole contention is that inquiry into Daughter's possible Indian heritage under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law (Welf. & Inst. Code, § 224 et seq.)[1] was inadequate.  We agree, and so we will conditionally reverse the order and remand only for compliance with ICWA and related California law, specifically for the Marin County Health

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

and Human Services (Department) to locate, if possible, the maternal grandfather and interview him about Daughter's possible Indian heritage, and for the juvenile court to ensure that this inquiry is conducted.

## BACKGROUND

A detailed recitation of the facts of these dependency proceedings is contained in our prior unpublished opinion, *In re Clare M.* (Dec. 30, 2021, A162576) [nonpub. opn.].[2] We set forth only the facts relevant to the ICWA issue raised on appeal.

In December 2020, the Department filed petitions alleging that Daughter and her half-brother (Son) came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1), failure to protect. The petitions alleged that abuse of alcohol by Mother made her unable to provide regular care for the children, and that her violent and aggressive behavior exhibited in front of the children made her unable to supervise and protect them, with the result that there was a substantial risk that they would suffer serious physical harm or illness. The petition as to Daughter alleged that Father had failed to adequately supervise or protect Daughter, by failing to provide her with regular care, or ensuring that her medical, dental, or basic needs were met.

---

[2] We granted Father's request to take judicial notice of this court's file in that appeal. Now, on our own motion, we also take judicial notice of the record filed in connection with writ proceedings initiated by Father and C.E. (Mother) following the court's order setting a section 366.26 hearing (*G.L., et al. v. Superior Court of Marin County* (A163952)), proceedings that we dismissed as abandoned. As the parties do, we will refer to the clerk's and reporter's transcripts filed in the prior appeal as "PCT" and "PRT," respectively; the clerk's transcript filed in the writ proceedings as "Writ CT"; and the clerk's and reporter's transcripts filed in this appeal as "CT" and "RT," respectively.

2

According to the detention report, the family came to the Department's attention in early December 2020, after police officers conducted a welfare check on the boat where Mother was living with her mother, Daughter, Son, and her other daughter S.P., who is not a subject of these proceedings. The police responded to a report of yelling and arguing from the boat. The maternal grandmother explained that her husband (the maternal grandfather) and Mother had gotten into a physical altercation in front of the children.[3] The police officers observed a lack of sanitation on the boat and hazardous conditions on the dock near the boat. The children appeared not to have bathed in several days, Mother was intoxicated and confrontational, and she threatened that if social workers came to the boat, she would harm them and shoot herself and the children.

As also documented in the detention report, Mother denied that she was a member of a Native American Tribe, but claimed "that her grandfather had Native American ancestry and was Esopus Lenape from the Algonquin nation." Father "stated that he is a federally Recognized Chief of the Mendocino Indian Reservation" and that Daughter "is registered as a Native American child under his registration number."

---

[3] It is unclear if the maternal grandfather also lived on the boat. The report states that the Child Abuse Hotline, which informed the Department of the police's welfare check on the family, indicated that Mother and the children recently had moved onto the boat with both the maternal grandmother and maternal grandfather. However, the maternal grandmother later told the social worker that the maternal grandfather "was sleeping under a bridge because he was not welcome on the boat." S.P. also stated that the maternal grandfather "sleeps underneath a freeway." The Department's subsequent six-month review report states that, according to the Marin County Sheriff's Office, the maternal grandfather was living in a homeless encampment in a park in Sausalito, which is where Mother also was living at one point during these proceedings.

The maternal grandmother stated that she, the maternal grandfather, and Mother were not registered members of any Native American tribe. She, however, reported that her family on her mother's side may be part of the Esopus Tribe, and that the maternal grandfather may be part of the Cherokee Tribe on his mother's side. The record does not show that the Department asked the maternal grandfather about his, and thus Daughter's, possible Indian heritage.

The maternal grandmother also stated that Father was a registered member of the Pomo Tribe in Mendocino County. The Department then contacted 12 separate Pomo Tribes. One tribe stated it was unfamiliar with Father or Daughter, and each of the remaining tribes stated it either had no record of Father or Daughter or that Father and Daughter were not registered with, or known members of, its tribe.

On December 15, the day of the detention hearing, Mother and Father each submitted a "Parental Notification of Indian Status Form" (ICWA-020 form). Mother indicated that she may be a member of or eligible for membership of federally recognized Indian tribe. Father wrote "Pomo" and "Apache" as the tribes that he was a member of or eligible for membership in. He also wrote, "I am a direct descendant of Cochise." Father further stated that he possessed an identification card indicating membership in the "Mendocino Reservation."

At the detention hearing, Father claimed he was the chief of the Mendocino Indian Reservation. The Department countered that "the tribe that he has named is not a federally recognized tribe," a point Father disputed. Father next asserted that his father was from the Pomo Tribe, and that his mother and grandmother were registered with the Mescalero Apache Tribe. Upon request of the court and the Department for information on the

4

paternal grandmother, Father was able to provide only her full name and year of birth. Following further discussion, the court found there was reason to believe Daughter is an Indian child and ordered the Department to complete further inquiry. Additionally, the court ordered Daughter detained and placed her in foster care.

On January 4, 2021, the Department filed its "1st ICWA Addendum" to its earlier jurisdiction report. It stated it had recently contacted the ICWA case manager of the Mescalero Apache Tribe and provided the name and birth year of the paternal grandmother. The case manager stated there was no record of her in the tribe's membership records. The Department also sent ICWA-030 form notices to the United States Department of the Interior's Bureau of Indian Affairs, the Bureau of Indian Affairs for the Sacramento area, and the Mescalero Apache Tribe. The notices listed the names of the parents; the maternal grandmother and grandfather; the paternal grandmother and grandfather; two paternal great-great grandmothers; and two paternal great-great grandfathers. With respect to the paternal grandmother, the Department included her year of birth and under "Current address," wrote "Asked and unknown [¶] North Carolina." As for the maternal grandfather, the Department wrote "[d]oes not apply" when asked to list a tribe or tribal membership, and therefore did not include his possible affiliation with the Cherokee Tribe.

On January 5, the court held the jurisdiction hearing and sustained the allegations of the petitions. At the conclusion of the hearing, Mother's counsel noted Mother's request for the Department to consider her relatives in San Jose as a possible placement for Daughter.

On January 21, the Department filed its disposition report. Father continued to claim he was the chief of the Mendocino Indian Reservation.

5

The Department also explained it had multiple conversations with Father, who "provided confusing information about his living situation, livelihood, and tribal affiliation" and "declined to talk about his past . . . ." Father was "dismissive of the [Department's] requests to identify and speak to the relatives or community members who he mention[ed] [were] supports to him and who may be able to confirm his statements." The Department also noted Mother's request at the jurisdiction hearing to consider her relatives in San Jose as a possible placement for Daughter. However, Mother did not provide further information regarding those relatives. In fact, Mother declined to speak with the Department about the case as of the time of the report.

On January 26, the court held the initially scheduled dispositional hearing. The court addressed the ICWA issue, beginning by stating that the Mendocino Indian Reservation is not a federally recognized tribe. Nonetheless, Father's counsel noted Father's insistence that his tribal reservation is federally recognized and that he would provide documents to support that claim. Counsel for Mother indicated "that [Mother's] maternal grandmother was 100 percent Esopus Lenape Algonquin Native American" and "that her brother is [a] member of the tribe." She gave the phone number of her brother, whom she claimed could provide more information. The court continued the hearing to February 11.

Pending that hearing, the Department submitted an addendum to its disposition report. The Department spoke with Mother's brother, who confirmed that the Esopus Lenape Algonquin is the tribe from which he and his family on his maternal grandmother's side are descended. That tribe, he explained, is part of the Lenape Nation of Pennsylvania, which is not federally recognized; it was only recognized by the State of Pennsylvania.

The Department also asked Father for contact information of the tribal

6

elders or other contacts of the Mendocino Indian Reservation. In response, Father stated he is the chief of the tribe and "you're looking at him." Based on the information thus far in the case, the Department stated it did not believe there was reason to know Daughter was an Indian child and recommended that the court find that ICWA did not apply.

Father then filed his "Response to Disposition Report and Statement in Support of Application of Indian Child Welfare Act." Father argued that ICWA applied to this case on the grounds that he resides on the Mendocino Indian Reservation, which he insisted was a federally recognized tribe. In support, he attached "relevant excerpts from the Executive Orders relating to Indian Reserves, from May 14, 1855 to July 1, 1902," as well as various land maps.

On February 11, the court held the contested disposition hearing. It stated it had reviewed Father's written response to the disposition reports and his supporting documentation. The court determined that Father failed to establish he was a member of, or eligible for membership in, any federally recognized tribe. The court also recounted the Department's recent inquiries of Mother's brother, who confirmed his membership in a tribe, but that the tribe also was not federally recognized. The court concluded, "[A]t this point despite some very extensive efforts on the part of the Department and I think on part of counsel—and I appreciate, Counsel, your efforts in making these inquiries with your clients—we have not been able to identify eligibility under [ICWA]. So at this time I'm making a finding that it does not apply."

Turning to disposition, the court declared Daughter a dependent and ordered reunification services for Mother only and paternity testing for Father. Mother and Father appealed, with Father's appeal not raising any ICWA issue. (*In re Clare M.*, *supra*, A162576.) We affirmed the dispositional

7

orders.  (*Ibid.*)

On July 1, the Department submitted its "ICWA Addendum," which reported it had received responses to its ICWA-030 notices from various tribes, including those named by the parents.  The responses indicated that Daughter was not a member or eligible for membership in any of the tribes.

On July 30, the Department filed its six-month status review report, outlining its recent communications with Father's brother and sister.  The brother stated that neither he nor his brother were Native American or had any tribal membership.  He also disclosed that the first name Father was using in these proceedings was not his real name and that he uses a "fake Indian ID" to receive government benefits.  The brother added that Father suffered from serious mental illness, that he had to limit his interactions with him, and that he did not trust him with personal information or money.  Father's sister also denied Native American ancestry or tribal membership, and stated that Father has "mixed up stories his whole life."

The court held the contested six-month review hearing over several days in September and issued its findings and rulings on October 5.  It terminated Mother's reunification services and set a section 366.26 hearing.  Mother and Father each filed a notice of intent to file a writ petition, but because neither of them subsequently filed any petitions, we dismissed the matter.  (*G.L., et al. v. Superior Court of Marin County*, *supra*, A163952.)

Prior to the section 366.26 hearing, the Department reported that during one virtual visit between Father and Daughter in December 2021, Father brought two individuals without permission from the Department.  The individuals were noted to be Father's relatives but were not identified.

On March 3, 2022, the court held the section 366.26 hearing over Zoom.  During the hearing, an individual using the name "Sister Who Walks With

8

Bears" joined the Zoom waiting room. The court paused the proceedings to determine the identity of the individual, who then provided her name and claimed she was "the ICWA representative for the Indian Child Welfare Act." Father's counsel interjected, stating, without taking a position, that under section 306.6, a non-federally recognized tribe could petition the court to be allowed to participate in the proceedings. The court noted that no such petition or request had been received and declined to allow the individual to remain in the proceedings. Before leaving the proceedings, the individual was asked to clarify which tribe she was appearing for. She responded she was appearing for Father and that he was from several tribes of California. The individual stated, "I'm the representative of all California tribes and the Women's Spiritual Leader, ICWA representative . . . it's called, 'Children From the Four Directions.'" When asked again to specify a tribe, she stated, "[Father] is, also, Pomo. I am Miwok." She stated she was appearing for the child who is of Pomo descent of Mendocino County, and reiterated she brought several documents but did not know what to do with them. She was then dismissed by the court from the proceedings, and the hearing was continued.

At the section 366.26 hearing on May 11, Father requested another continuance so that he could "provide full and complete documentation regarding his ICWA status in the case." The court denied the request, noting that the ICWA issue had been addressed extensively and that father already had the opportunity to present any relevant information.

The court ultimately terminated the parental rights of both parents and identified adoption as the permanent plan for Daughter.

Father appealed.[4]  He filed an opening brief, and the Department, a respondent's brief.  Father did not file a reply brief.

## DISCUSSION

Father contends the Department and the juvenile court failed to fulfill their duties to adequately inquire into Daughter's possible ancestry pursuant to California law implementing ICWA.  We agree.

### The Law

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement with non-Indian families.  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).)  "ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes."  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*), citing 25 U.S.C. § 1921; 25 C.F.R. § 23.106.)  California has adopted statutes and rules that "implement, interpret, and enlarge upon" ICWA.  (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1157; see generally § 224 et seq.)

Under California law, the juvenile court and the Department "have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . has been filed, is or may be an Indian child."  (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a); see *Isaiah W.*, *supra*, 1 Cal.5th at pp. 9, 14.)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings.  First, from the [Department's] initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  (§ 224.2, subds. (a), (b).)

---

[4] Mother has filed a separate appeal (A165575) that is currently pending in this court.

10

Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the [Department] 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) . . . ; *id.*, subd. (d) . . . ; § 224.3 . . .)." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1052.)

At issue here is the duty of initial inquiry. Under section 224.2 subdivision (b), the Department had a duty to ask, "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." "Although commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' (§ 224.2, subd. (a)) and continues throughout the dependency proceedings. [Citation.]" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

"Extended family members" include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definition].)

The juvenile court must determine whether ICWA applies to the child's proceedings. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552.) " 'The juvenile court may find ICWA does not apply following "proper and adequate further inquiry and due diligence" by [the Department] because "there is no reason to know whether the child is an Indian child" or because "the court does not have sufficient evidence to determine that the child is or is not an Indian child" ' [citation], but the court may not find that ICWA does not apply when

11

the absence of evidence that a child is an Indian child results from a [Department] inquiry that is not proper, adequate, or demonstrative of due diligence." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408, citing *In re D.F.* (2020) 55 Cal.App.5th 558, 570–571 [in turn citing § 224.2, subds. (g) and (i)(2)].)

We review the juvenile court's ICWA findings under the substantial evidence test, but "where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)[5]

**The Juvenile Court's ICWA Finding Was Error**

As a preliminary matter, the Department "acknowledges and concedes that a parent's inaction in the juvenile court does not preclude appellate review of the substantive issue of whether the ICWA applies . . . ." However, the Department contends Father's assertions are premised on a violation of section 224.2, a state statute, rather than a violation of federal law under ICWA; thus, the Department maintains Father forfeited his contention by failing to raise the issue in the juvenile court or in his appeal from previous orders. We disagree.

As our Supreme Court has explained, ICWA *and the California laws implementing it* protect the interests of the Indian tribes "that are separate and distinct" from those of the parents. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 13.) Based on this reasoning, case law has held that "the parent's failure to object in the juvenile court to deficiencies in the investigation or noticing does not

---

[5] The Department agrees that the juvenile court's factual determinations are reviewed for substantial evidence, but argues that the court's finding regarding "the adequacy of an agency's ICWA inquiry" is reviewed for abuse of discretion, as opposed to de novo. Our conclusion in this case would be the same under either standard.

preclude the parent from raising the issue for the first time on appeal." (*In re K.R.* (2018) 20 Cal.App.5th 701, 706 (*K.R.*); accord, *In re A.R.* (2022) 77 Cal.App.5th 197, 204.)  Moreover, because the juvenile court's duty to comply with ICWA is ongoing until it is determined by the relevant tribe, following adequate notice, that the child is not an Indian child (*Isaiah W.*, at pp. 6, 11), "the parent's failure to appeal from an earlier order does not preclude the parent from raising the issue of ICWA compliance in an appeal from a later order, including an order terminating parental rights." (*K.R.*, *supra*, 20 Cal.App.5th at p. 706, citing *Isaiah W.*, at pp. 6, 14–15.)  It is thus appropriate for us to consider Father's ICWA challenge on appeal.

Turning to the merits, Father's sole contention is that the Department failed to satisfy its initial inquiry duty because it did not interview extended family members—namely the maternal grandfather and the paternal grandmother—and other unnamed maternal and paternal relatives about Daughter's potential Indian ancestry.

Father is correct that there is no evidence that the Department interviewed the maternal grandfather, who reportedly was involved in the physical altercation with Mother that prompted the initial child welfare referral in this case.  The maternal grandmother was in contact with the Department and provided the maternal grandfather's name, as well as her belief that he had Cherokee heritage.  As noted above, although it is unclear if he lived with the maternal grandmother on the boat, the record indicates that the maternal grandmother and law enforcement knew his whereabouts. Yet, there is no information in the record that the Department made any effort to contact the maternal grandfather to explore his possible Cherokee heritage.  The Department thus failed to satisfy its duty of inquiry under section 224.2, subdivision (b).

13

Responsibility for this omission rests with not only the Department, but also the juvenile court, because it failed to ensure the Department had satisfied its duties of inquiry before finding ICWA did not apply. (Cf. *In re Rylei S.* (2022) 81 Cal.App.5th 309, 320 [juvenile court had a duty to ensure the child protective agency made the relevant inquiries and its failure to do so was error].)

The Department does not deny it failed to interview the maternal grandfather about potential Indian ancestry, but suggests it did not need to. Relying on *In re Ezequiel G.* (2022) 81 Cal.App.5th 984 (*Ezequiel G.*), the Department argues that it would be "absurd at best and impossible at worst" to read section 224.2, subdivision (b) as requiring it to inquire "of every member of a child's extended family." (*Ezequiel G.*, *supra,* 81 Cal.App.5th at p. 1006.) According to that case, "the focus of the court's analysis should not be on the number of individuals interviewed, but on whether the [Department's] ICWA inquiry has yielded reliable information about a child's possible tribal affiliation." (*Id.* at p. 1009.) And here, the Department suggests, its inquiries of Mother and her brother yielded reliable information that the tribe which they claimed they were members or eligible to be members of (the Lenape Nation of Pennsylvania) was not a federally recognized tribe and thus not subject to ICWA. We are not persuaded.

In *Ezequiel G.*, the court stated that "the key inquiry should be whether the ICWA inquiry conducted has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding 'is or may be an Indian child' . . . ." (*Ezequiel G., supra*, 81 Cal.App.5th at p. 1009.) Here, the inquiry conducted of Mother and her brother did not conclusively answer this question, because nothing they said undermined the maternal grandmother's statement that the maternal grandfather may have Cherokee

14

heritage. Mother and her brother claimed Indian heritage on the maternal grandmother's side; they did not address, much less deny, possible Indian heritage on the maternal grandfather's side. They also did not claim that the Lenape Nation was the only tribe with which the family was affiliated. Further, there is nothing to indicate that the maternal grandmother was not a reliable source. In short, it was neither "absurd" nor "impossible" for the Department to have interviewed the maternal grandfather about Daughter's possible Indian ancestry.

We reject, however, Father's challenge with respect to the paternal grandmother, whom the Department also did not interview. Unlike with the maternal grandfather, the record is not silent as to the Department's efforts to locate and gather the relevant information from the paternal grandmother. At the jurisdiction hearing, Father claimed his mother may be registered with the Mescalero Apache Tribe. Upon request for her information by the court and the Department, Father was able to provide only her name and year of birth. In the ICWA-030 forms that the Department sent to the Bureau of Indian Affairs and various tribes, the Department listed the paternal grandmother's name, and under "Current address," wrote "Asked and unknown . . . [¶] North Carolina." With the limited information it had, the Department then asked the ICWA case manager for the Mescalero Apache Tribe whether the paternal grandmother was registered with the tribe, to which the case manager responded the tribe had no record of her. We thus may infer from the record that the Department did make an effort, albeit an unsuccessful one, "to locate and interview [the paternal grandmother] to obtain whatever information [she] may have as to [Daughter's] possible Indian status." (*K.R.*, *supra*, 20 Cal.App.5th at p. 709.)

To the extent Father argues the Department had a duty to inquire of

15

extended relatives whose contact information it could not obtain, case law suggests the contrary. As some courts have put it, ICWA did not require the Department "to 'cast about' for information or pursue unproductive investigative leads" (*D.S.*, *supra*, 46 Cal.App.5th at p. 1053), such as where, for example, "parents 'fail[ ] to provide any information requiring follow-up' . . . or refuse to talk to [the Department]." (*In re A.M.* (2020) 47 Cal.App.5th 303, 323 [agency's failure to interview maternal relatives was reasonable where the mother could not provide information about maternal relatives, and no maternal relative appeared at any hearing or participated in the matter].)[6]

**The Error Was Not Harmless**

Having found error with respect to the Department's failure to interview the maternal grandfather, we turn to the issue of prejudice.

The appellate courts are divided on what showing of prejudice warrants reversal for ICWA inquiry errors, and the issue is currently pending before our Supreme Court. (*In re Dezi C.* (2022) 79 Cal.App.5th 769 (*Dezi C.*), rev.

---

[6] For similar reasons, we also reject Father's claim the Department should have inquired of certain maternal and paternal relatives. The maternal relatives refer to Mother's "relatives in San Jose" whom she asked the Department to consider as a possible placement for Daughter. The paternal relatives refer to two individuals whom Father brought to a visit with Daughter without prior authorization. The record does not identify any of these individuals or their relationship, if any, to Daughter. Thus, it is unclear whether any of them qualify as an "extended family member" or a necessary subject of ICWA inquiry under section 224.2, subdivision (b). The record indicates that Mother, who at times declined to speak to the Department about the case, failed to provide the names and contact information of the relatives. As did Father, who was "dismissive" of the Department's requests for information on his relatives. As noted, ICWA did not obligate the Department "to 'cast about' for information or pursue unproductive investigative leads." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1053.)

granted Sept. 21, 2022, S275578.)

Courts have employed varying standards when assessing deficiencies in the duty of inquiry, holding, for instance, that: (1) deficient initial inquiry is reversible per se (*In re G.H.* (2022) 84 Cal.App.5th 15, 32; *In re A.R., supra,* 77 Cal.App.5th at p. 207; see *In re K.H.* (2022) 84 Cal.App.5th 566, 617–618 (*K.H.*) [interpreting these cases as "involv[ing] records so undeveloped that the inadequacy of the inquiry is readily apparent and there simply is no basis on which to find substantial evidence would support a contrary conclusion"]; (2) deficient inquiry requires reversal where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 (*Benjamin M.*)); (3) deficient inquiry is harmless unless the record contains information suggesting a "reason to believe" the child is an Indian child (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779); and (4) deficient inquiry is harmless unless the record below demonstrates or the parent on appeal makes an offer of proof or other affirmative assertion of Indian heritage (the "presumptive affirmance" approach). (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1069 (*A.C.*); accord, *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430–1431 (*Rebecca R.*).)

The court in *K.H.* looked at the issue through a slightly different lens. It explained that the relevant rights under ICWA belong to Indian tribes, which have a statutory right to receive notice when an Indian child may be involved so they can determine whether the child is an Indian child, and "prejudice to those rights lies in the failure to gather and record the very information the juvenile court needs to ensure accuracy in determining whether further inquiry or notice is required." (*K.H.*, *supra*, 84 Cal.App.5th at p. 591.) The question for the reviewing court is whether the trial court's

17

discretionary determination of whether the agency conducted an adequate and diligent ICWA inquiry is supported by substantial evidence, or whether the agency's efforts "fall so short of the mark that the evidence is patently insufficient to support the court's determination, and [the court] abuses its discretion in finding the agency's inquiry was proper, adequate, and discharged with due diligence." (*Id.* at p. 604.) Considering the appropriate standard for reversal, the *K.H.* court concluded that "where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*Id.* at p. 610.)

Father does not expressly endorse any one particular standard, but argues that we "should eschew any suggestion by the department to apply harmless error analysis to its failure to conduct a proper ICWA inquiry." The Department asserts that under any of the standards, the error was harmless. Here, reversal is required under each of the harmless error rules except the presumptive affirmance rule from cases such as *A.C.*, which we decline to follow for reasons we explain.

Numerous courts, including a different panel of the same court that decided *A.C.,* have criticized the presumptive affirmance approach. (See *K.H.*, *supra*, 84 Cal.App.5th at pp. 612–614; citing *In re Y.M.* (2022) 82 Cal.App.5th 901, 913–915; *Dezi C.*, *supra*, 79 Cal.App.5th at pp. 777–778; *Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 743–744; *A.C.*, *supra*, 65 Cal.App.5th at pp. 1074–1078 (dis. opn. of Menetrez, J.).) As explained in *K.H.*, courts have found the approach "suffers from three main shortcomings": it would routinize consideration of new evidence on appeal, which is generally disfavored; it shifts the burden of investigation onto parents in dependency

18

proceedings; and it does not sufficiently serve the interests of the Native American tribes because prejudicially deficient inquiries will go uncorrected if an appealing parent is unwilling or unable to make a meaningful proffer on appeal. (See *K.H.*, at pp. 612–614 [and cited cases].) These criticisms are well taken.

Moreover, essential to the prejudice inquiry in *Rebecca R.*, a case followed by *A.C.* and cases cited therein, was the fact that the father was complaining on appeal that he was not asked about his Indian ancestry. Thus, the court found it incumbent upon the father to demonstrate prejudice on appeal by stating what he obviously knew. (*Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431.) Here, in contrast, Father is the appealing parent, and the issue is the ancestry of the other parent, namely of the maternal grandfather. As such, unlike the situation in *Rebecca R.*, we cannot say that "[t]he knowledge of any Indian connection is a matter wholly within the appealing parent's knowledge. . . ." (*Ibid.*) Indeed, there is nothing in the record to indicate that Father has any knowledge of Mother's ancestry. As explained in *Benjamin M.*, if the presumptive affirmance rule is "read as saying a parent must claim she *herself* has Indian ancestry, the rule would apply to deny Mother relief because she has disclaimed such ancestry. If read somewhat more broadly as saying a parent must claim the *child* has Indian ancestry, then Mother could make that claim based only on knowledge of Father's ancestry, which she has no legal duty or necessary logical reason to know." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 745.) Thus, "the facts of this case show why [the presumptive affirmance approach] is contrary to the framework of ICWA and to the flexible, case-by-case approach that a harmless error analysis usually entails." (*Ibid.*)

For these reasons, we will move on to analyze the error here under the

other prejudice standards.  Ultimately, we need not choose among the remaining standards because, under any of them, the error here was not harmless.

Under the reversible per se approach, reversal would clearly be required.  Under *Benjamin M.*, the Department's deficient inquiry was not harmless.  As discussed, the record indicates that the maternal grandfather, ostensibly, was accessible through the maternal grandmother with whom the Department had contact, and that his responses would have borne meaningful information on Daughter's Indian status.  (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 744–745.)  The error also would not be harmless under *Dezi C.*, which stated that "a reviewing court would have 'reason to believe' further inquiry might lead to a different result if the record indicates that someone reported possible American Indian heritage and the agency never followed up on that information."  (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779.)  Unlike in *Dezi C.*, which found the deficient inquiry harmless where both parents signed ICWA-020 forms attesting they had no Indian ancestry (*id.* at p. 776), the record does not contain similar denials from Mother or Father.  Additionally, as explained, the maternal grandmother informed the Department that the maternal grandfather may have Cherokee heritage.  The record thus discloses a "reason to believe" that a further inquiry might lead to a different result.  (*Id.* at p. 779.)

Finally, "where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard."  (*K.H.*, *supra*, 84 Cal.App.5th at p. 610.)  Under this standard, too, the error here cannot be said to be harmless.

## DISPOSITION

The order terminating parental rights is conditionally reversed. The matter is remanded with directions for the juvenile court and the Department to comply with the inquiry and, if appropriate, notice provisions of ICWA and related state law. If, after compliance with the law, the juvenile court concludes ICWA does not apply, the order terminating parental rights shall immediately be reinstated. If, after proper inquiry and notice to applicable tribes, the court finds that ICWA does apply, the court shall proceed in conformity with ICWA and related state law.

_____
Richman, J.

We concur:

_____
Stewart, P.J.

_____
Markman, J. *

*In re Clare M.* (A165427)

  *Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.